## Affidavit of Joseph P. Barrett

I, Joseph P. Barrett, being duly sworn, deposes and states as follows:

1.  I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed for approximately 21 years. I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA") task force in Worcester, Massachusetts. In that capacity, I participate in the investigation of illegal trafficking of narcotics. I completed the three month narcotics training program at the DEA Training Academy in Glynco, GA. I have also received ongoing specialized training in the investigation of narcotics trafficking, the identification of illegal drugs and various investigative techniques. I have also attended courses involving illegal drug trafficking from the Bureau of Immigration and Customs Enforcement (formerly United States Customs Service), the German Federal Police and the German Customs Service. During the course of my service as a DEA Special Agent, I have been involved in hundreds of narcotics investigations. Many such investigations involved the execution of search warrants. I have seized and examined controlled substances including crack cocaine, heroin, methamphetamine and marijuana, and have testified in the federal court and state court regarding my participation in such investigations. Additionally, I have interviewed drug

1

manufacturers, drug sellers and drug users. Based upon my training and experience, I have become familiar with methods employed by narcotics traffickers to distribute narcotics and dispose of narcotics proceeds. I have conducted or participated in physical surveillance, undercover transactions, the introduction of undercover agents, the execution of search warrants, the debriefing of informants and cooperating witnesses, and the reviews of taped conversation and drug records. Through my education, training, and experience, I have become familiar with the manner in which illegal drugs are manufactured, imported, transported, stored, and distributed; the practices and procedures commonly employed by narcotics traffickers to conduct their business, including methods of communications; the method of payment for such drugs; and some of the methods that are used to disguise the source and nature of the profits made by narcotics traffickers.

2. I submit this affidavit in support of a criminal complaint against Keith Goodhue (hereafter "Goodhue"). For the reasons outlined in this affidavit, there is probable cause to believe that Goodhue did knowingly and intentionally possess List I Chemicals and List II Chemicals as defined in Title 21, United States Code, Section 802(34) and (35), namely ephedrine, pseudoephedrine, red phosphorous and iodine with the intent to manufacture methamphetamine, a Schedule II controlled substance,

in a manner other than authorized by Title 21, United States Code, Sections 801 through 904, in violation of Title 21, United States Code, Section 841(c)(1).

3. The information contained in this affidavit is known to me based upon personal knowledge, or has been told to me by other law enforcement agents participating in this matter.

4. This affidavit is submitted for the limited purpose of obtaining a criminal complaint against Keith Goodhue. Accordingly, I have not included each and every fact known to me and to other agents working in this investigation.

5. On November 11, 2003, Webster Police officers responded to call for emergency medical assistance regarding a possible overdose at a residence located at 4 Goodness Street, Webster, MA. Paramedics and police arrived at the residence and were let in to the residence by Keith Goodhue. Officers and paramedics were taken to the bedroom where they observed Keith Goodhue's wife, Susan Goodhue, lying unconscious with apparent fresh needle marks on her arm. Keith Goodhue advised that his wife had used heroin in the past, but that she had not used any on this day. Paramedics attempted to revive Susan Goodhue using a variety of medical techniques, but were unsuccessful. Paramedics took Susan Goodhue out of the house and to the hospital. At the time it was unknown what substance Susan Goodhue may have injected, but it appeared that a needle had been used to make the injection.

6. While the paramedics were taking Susan Goodhue out of the residence, officers observed a stained glass tube nearby on a wall shelf in plain view, which appeared consistent in the officers experience with "pipe" used to smoke crack cocaine or marijuana. Officers also observed two small amber glass bottles, a glass straw that contained a reservoir at one end with a bowl that appeared to be stained and burnt, and two smaller glass pipes all items consistent in the officers' experience with smoking illegal drugs. One of the glass tubes appeared to contain small white crystals.

7. Goodhue advised the officers that he did not believe that there were any narcotics in the house. Officers also observed two childrens' beds in the room as well as toys and clothes for small children scattered about the bedroom and learned that the Goodhues had two small children sleeping in the room. Believing that there may be a needle and syringe in the room containing a dangerous controlled substance, and concerned that small children appeared to sleep and play in the room, officers began looking around the room for the needle and syringe. Keith Goodhue advised that he would show the officers where the needles were just to get rid of them. Officers then recovered three needles and syringes in the top drawer of the dresser. Officers also observed a glass evaporater or condenser used in a chemistry set with an attached rubber hose and a glass

jar with red stained coffee filters that appeared to be wet and marijuana seeds. In a second dresser drawer, police found a bottle of lye. Goodhue advised that he did not know the needles were in the drawer and that he didn't know what his wife was doing behind his back.

8. Officers then advised Goodhue of his Miranda rights. Goodhue agreed to speak to officers and also signed a written consent permitting the officers to search the rest of the residence.

9. After being advised of his Miranda rights, Goodhue told the officers that he would show them where the lab equipment was located. Officers recovered lab equipment including among other items, condensers, glass tubes, a two pan burner, a propane tank, a round bottom flask, glass beakers, tubing, funnels, coffee filters, scales, a pestle, and various narcotics paraphernalia including empty blister packs of cold medication containing pseudoephedrine.

10. Police and DEA agents also recovered containers and bottles containing various liquids and powders which were submitted to the Massachusetts State Police Crime Laboratory for further analysis. A chemist weighed and analyzed the items and identified over 50 grams of red phosphorous, over 110 grams of iodine, over 300 grams of Red Devil Lye, quantities of ephedrine and pseudoephedrine, Coleman fuel and a small quantity of liquid

which tested positive for methamphetamine. The chemicals appeared to be in various stages of methamphetamine manufacturing. I know from my training and experience that there are a variety of ways to manufacture methamphetamine. Many of the red phosphorous methods of manufacturing methamphetamine (more commonly known as the "red-P" method) require extracting ephedrine or pseudoephedrine from the cold tablets, and combining the ephedrine and pseudoephedrine with red phosphorous, iodine crystals, lye, water and propane in a manufacturing process that utilizes common laboratory equipment and a cooking device such as a stove or burner.

11. After being advised of his <u>Miranda</u> warnings, Keith Goodhue gave a written statement admitting that he learned how to "cook" methamphetamine from watching another individual while living in New Mexico and that he had used methamphetamine. Goodhue said he brought the laboratory equipment back with him from New Mexico when he and his wife moved back to Massachusetts and that he kept it in the closet in the bedroom. Goodhue admitted that a few days prior to November 11, 2003, he pulled out the chemicals and laboratory equipment and attempted to make methamphetamine. Goodhue admitted that he had been intending to manufacture methamphetamine in order to sell it for money. Goodhue further stated that he was not sure whether his wife had ingested some of the chemicals thinking it was methamphetamine

6

and wondered whether ingesting the chemicals may have caused her illness.

### Conclusion

WHEREFORE, your affiant respectfully requests that a criminal complaint issue charging Keith Goodhue with knowingly and intentionally possessing ephedrine, pseudoephedrine, red phosphorous and iodine, listed chemicals as defined in Title 21, United States Code, Section 802 (34) and (35), with the intent to manufacture methamphetamine, a Schedule II controlled substance, in a manner other than authorized by Title 21, United States Code, Sections 801 through 904, in violation of Title 21, United States Code, Section 841(c)(1).

*Joseph P. Barrett*
JOSEPH P. BARRETT
Special Agent
Drug Enforcement Administration

Sworn to me and subscribed in my presence this 26th day of May, 2005

_____
CHARLES B. SWARTWOOD, III
Chief United States Magistrate Judge